IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

EDUARDO AVALO,

Defendant.

CRIMINAL CASE NO.

1:15-CR-00297-ELR-JFK-1

## ORDER and REPORT AND RECOMMENDATION

Pending before the court is Defendant Eduardo Avalo's motion [Doc. 61] to suppress evidence obtained as the result of the execution of a Paulding County magistrate court search warrant, signed on June 27, 2014, and a federal search warrant, signed on July 9, 2015, both for his residence located at 9674 Villa Rica Highway, Villa Rica, Georgia 30180.  In support of the motion to suppress the 2014 Paulding County search warrant, Defendant contends that (1) he is entitled to a <u>Franks</u> hearing[1] because the affiant for the search warrant deliberately or with reckless disregard for the truth omitted material information from the affidavit; (2) probable cause is lacking because the affidavit for the search warrant depends on stale information; and (3) probable cause is lacking because the affidavit fails to provide sufficient information

---

[1] <u>See</u> <u>Franks v. Delaware</u>, 98 S. Ct. 2674 (1978).

to allow the issuing judge to evaluate the credibility of the confidential informants relied on by the affiant. [Doc. 65 at 12-15, 17, 25, 28]. And, with respect to the 2015 federal search warrant, Defendant contends that (1) he is entitled to a <u>Franks</u> hearing because the affiant for the search warrant deliberately or with reckless disregard for the truth included misleading information in the affidavit and omitted material information from the affidavit; (2) probable cause is lacking because the affidavit for the search warrant depends on stale information; and (3) probable cause is lacking because of the inclusion of irrelevant information in the affidavit that fails to provide a nexus between the evidence being sought and his residence. [<u>Id.</u> at 2-12, 17-27]. The Government opposes the motion to suppress contending that Defendant has not made a sufficient showing to entitle him to a <u>Franks</u> hearing and that each affidavit provides probable cause for the searches conducted at Defendant's residence in 2014 and 2015.[2] [Doc. 67, Sealed Exhibit ("Exh.") 1 ("2014 Search Warrant and Affidavit")[3] and Sealed Exh. 2 ("2015 Search Warrant, Application & Affidavit")].

---

[2]Defendant also filed a motion [Doc. 60] to suppress statements that he made on July 2, 2014, asserting his rights under <u>Miranda v. Arizona</u>, 86 S. Ct. 1602 (1966). This motion was deferred for resolution to the District Court. [Doc. 62].

[3]The Affidavit is identified in the exhibit as "Attachment (III) Probable Cause."

2

Defendant also seeks to suppress evidence obtained from his cellular telephone, seized on July 14, 2015.  Defendant contends that he did not voluntarily consent to a search of the cellular telephone.  [Docs. 61, 85].  An evidentiary hearing was held on the motion to suppress on July 19, 2016.  [Doc. 84].[4]  The Government, however, contends that Defendant's consent to the search was voluntary or that, in the alternative, the inevitable discovery doctrine applies.  [Doc. 86].

## I.  2015 Federal Search Warrant, Application & Affidavit

This court previously fully addressed all of the arguments made by Defendant in the current motion to suppress, as supplemented by his brief in support [Docs. 61, 65], in the report and recommendation issued on the first motion and supplemental motion to suppress [Docs. 23, 29, 33].  Defendant had an opportunity to object to that report and recommendation and relied entirely on the arguments previously submitted to the Magistrate Judge.  [Doc. 37].  The District Court reviewed the report and recommendation and Defendant's objections thereto and entered an order adopting the report and recommendation rejecting all of the challenges that Defendant now repeats to the 2015 search warrant, application and affidavit.  [Doc. 39].  The court will not restate the analysis and reasoning set forth in the first report and recommendation.

---

[4]Citations to the evidentiary hearing transcript are:  (Tr. at ).

The court has carefully reviewed the motions [Docs. 23, 29] to suppress initially filed in comparison to the pending motion to suppress and brief in support [Docs. 61, 65] and has found no substantive difference in the grounds raised or the arguments that Defendant makes in seeking suppression. And, as to the 2015 search warrant, application and affidavit, nothing that Defendant presents in his reply brief [Doc. 72] alters this court's conclusion that the motion to suppress should be denied - again.

With respect to his reply argument in support of obtaining a <u>Franks</u> hearing based on the alleged misrepresentations regarding the GPS tracker information, Defendant attempts, based on pure speculation as to what information was available to the affiant in July 2015, to make a <u>Franks</u> showing. The court notes that Defendant's argument is not based on the offer of any evidence, or even argument, not available when his first motions to suppress were under consideration and does not alter the irrefutable evidence that the affidavit simply does not contain misrepresentations about the drug buyer, Capote, being at Defendant's residence as stated in the affidavit. Specifically, without any offer of proof to support these statements, Defendant contends that the affiant used Google Maps - and apparently solely used Google Maps - when analyzing the GPS data to track Capote's movements, i.e., which placed Capote's vehicle in the vicinity of but not at Defendant's residence,

4

and that the evidence that the affiant had when swearing to the affidavit - and apparently the only information that the affiant had - was based on the Google Maps placement of Capote's vehicle.  Therefore, Defendant's counsel concludes that the affiant had to be misrepresenting what he knew to the Magistrate Judge.  [Doc. 72 at 2-3].

As set forth in the first report and recommendation, "[T]o prevail in a Franks challenge one must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant."  O'Ferrell v. United States, 253 F.3d 1257, 1267 (11th Cir. 2001) (citation omitted).  First, the information in the affidavit simply is not untrue as discussed in the first report and recommendation.  [Doc. 33 at 12-14].  And, second, Defendant's counsel's contentions set forth *supra* do not constitute "proof" either that the affidavit included misrepresentations or that the affiant knowingly or even recklessly included in the affidavit any misrepresentations about the results of the GPS tracking data.  See United States v. Flowers, 531 Fed. Appx. 975, 981 (11th Cir. 2013) ("Franks requires the defendant to offer proof that the affiant had the requisite intent[;]" noting that

Franks offered as examples of supporting proof, including, "'affidavits or sworn or otherwise reliable statements of witnesses,' apart from the warrant affidavit") (quoting Franks, 98 S. Ct. at 2684); United States v. Underwood, 2011 WL 2036498, at *1 (M.D. Fla. May 24, 2011) (the allegations by the defendant's counsel in the brief in support of the motion to suppress, "without more, cannot be considered by the Court in making up for [the] deficiency" in providing no offer of proof).  There is no offer of proof before the court that the affiant, through word or deed, has otherwise stated that the information set forth in the affidavit was false or intended to be misleading or that he lacked a good faith and reasonable belief in his statements concerning the GPS tracking data.  See O'Ferrell v. United States, 32 F. Supp. 2d 1293, 1301 (M.D. Ala. 1998) ("Reckless disregard for the truth . . . occurs where a government agent or instrumentality harbored or should have harbored serious doubts about the truth of a statement but made the statement anyway."); accord United States v. Gonzalez, 2010 WL 2721882, at *13 (N.D. Ga. May 25, 2010) ("Additionally, [r]ecklessness may be inferred from circumstances evincing obvious reasons to doubt the veracity of the allegations.") (citations and internal quotation marks omitted).

As to the other grounds in support of the motion to suppress the fruits of the 2015 search warrant, application and affidavit, Defendant's reply offers no new

6

arguments. [Doc. 72 at 3-6]. Accordingly, for the reasons stated in the first report and recommendation and noted *supra*, the court again **DENIES** Defendant's request for a <u>Franks</u> hearing and **RECOMMENDS** that Defendant's motion [Doc. 61] to suppress the fruits of the execution of the 2015 search warrant be **DENIED**.

## II.     2014 Paulding County Search Warrant and Affidavit

In support of the motion to suppress the fruits of the 2014 search warrant, Defendant asserts that the affiant intentionally omitted "details" favorable to Defendant and generally references the omission of information establishing the reliability of the various confidential informants relied on by the affiant to establish probable cause and specifically identifies that, for the June 10, 2014, controlled buy occurring at Defendant's residence, the affiant did not state that the description of the drug seller did not match Defendant's description. [Doc. 65 at 13-15]. Defendant also contends that the affidavit for the search warrant fails to establish probable cause for two reasons: (1) because the affiant relied on stale information, that is, the 2004 investigation of Defendant's activities, confidential informant statements based on Defendant's 2010 activities and a 2013 investigation of Defendant's activities [<u>Id.</u> at 25-26], and (2) because the affiant failed to provide sufficient information for the issuing judge to evaluate the credibility of the confidential informants [<u>Id.</u> at 28].

### a.      Search Warrant and Affidavit

The Paulding County magistrate court search warrant, issued on June 27, 2014, and executed on July 2, 2014, authorized the search of the residence located at 9674 Villa Rica Highway, Villa Rica, Georgia, including curtilage, outbuildings, vehicles and persons located at the residence ("Subject Residence").  [2014 Search Warrant]. And the issuing judge authorized the officers to search for:  controlled substances, U.S. currency, drug paraphernalia, notes, etc., pertaining to drug related activity, documents related to violation of the Georgia Controlled Substance Act, and electronic media. [Id.].  In the affidavit, the affiant, Agent Joey Horsley, a fifteen year veteran of the Paulding County Sheriff's Office ("PCSO") and detached to the Haralson-Paulding Drug Task Force ("HPDTF"), first provided an overview of his training and experience, particularly as pertains to drug trafficking investigations. [2014 Affidavit]. The affiant stated that the information provided in the affidavit is derived "from a reliable Confidential Informant along with other Law Enforcement sources in the Metro Atlanta area."  [Id.].

In support of probable cause, the affiant relayed information provided by a Cooperating Witness ("CW") on July 26, 2010, following the CW's arrest for possession of a large amount of marijuana.  The CW advised that he had obtained the

marijuana from Eduardo Avalo ("Defendant"), an older Hispanic male, at the Subject Residence and that Defendant only sold large quantities of marijuana and continued to deal despite a previous arrest, in 2004, by the Drug Enforcement Administration ("DEA") at the Subject Residence.  [Id. ¶ 1].  The affiant then relayed information provided by the West Metro Regional Drug Task Force ("WMDTF") concerning the February 2013 arrest of Carl Lee Ridge, Jr., for trafficking methamphetamine.  Ridge advised the officers that the methamphetamine was obtained by Ridge and a second man, Roberto Gonzales, from a person known as "Ed," an older Hispanic male who lived on Villa Rica Highway.  [Id. ¶ 2].  The affiant stated that he had information verifying that Gonzales "is related to and/or lived with" Defendant at the Subject Residence and that he believes "Ed" is Defendant.  [Id.].

In May 2014, the affiant received information from an agent with the Georgia Bureau of Investigation ("GBI"), assigned to the WMDTF, who advised that a case was recently opened involving Hispanic sources receiving heroin and methamphetamine from the Subject Residence.  [Id. ¶ 3].  The affiant also related information obtained on June 10, 2014, from two confidential informants ("CI 84-460" and "CI 84-461") who advised that a Hispanic male was trafficking large quantities of methamphetamine out of the Subject Residence.  CI 84-460 and CI 84-461 advised the

9

affiant that they do not enter the Subject Residence but travel there with Jose Fonseca ("Joey") and that he enters the Subject Residence, retrieves the methamphetamine, and delivers the drugs to the CIs.  The CIs advised that they have seen an older Hispanic male at the Subject Residence interacting with Joey but, based on the description, the affiant stated, "this subject they are referring to is not [Defendant] but Roberto Gonzales."  [Id. ¶ 4].

On June 18, 2014, the affiant met with CI 84-460 and CI 84-461[5] in order to conduct a controlled buy.  After searching the CIs' persons and vehicle and finding no contraband, funds were provided for the drug purchase.  The CIs met with Joey as arranged and traveled with him to the Subject Residence, as observed by the affiant. Shortly thereafter, the affiant observed the CIs and Joey leaving the Subject Residence. The CIs then met with the affiant and provided him with a quantity of methamphetamine obtained from Joey in the driveway of the Subject Residence.  The CIs advised the affiant that Joey referred to a thin Hispanic male, early 30's, as his "Boss's Nephew."  [Id. ¶ 5].  On June 20, 2014, the affiant spoke with an officer of the DeKalb County Police Department concerning surveillance of a Hispanic heroin

---

[5]The affidavit identifies the CIs as 84-560 and 84-561.  [Id. ¶ 5].  Either the initial numerical reference [Id. ¶ 4] or this reference appears to be a typographical error.  The court will continue to refer to the CIs based on the initial identification.

10

trafficker who was followed to the Subject Residence and remained overnight. The vehicle that was followed to the residence was registered to Joey, "who is the unwitting informant in this case." [Id. ¶ 6]. The affiant then stated that, within the last seventy-two hours, another controlled buy was made by CI 84-460 and CI 84-461, following the modus operandi outlined for the first buy. [Id. ¶¶ 4, 7]. The CIs advised the affiant that Joey stated his "Boss had a very large amount of methamphetamine available to purchase." [Id. ¶ 7].

Finally, the affiant advised that he reviewed the 2004 DEA case listing Defendant's residence as the Subject Residence and that the Subject Residence is listed on his driver's licence but that Defendant is not the actual property owner. [Id., Independent Investigation].

> **b.    Discussion**

> **1.    Franks Hearing**

Defendant first contends that "favorable details" were omitted by the affiant from the affidavit for the search warrant. [Doc. 65 at 12]. Defendant then refers to the lack of information relevant to the reliability of the various confidential informants

11

relied on by the affiant and, with respect to the June 10, 2014,[6] controlled drug buy, the failure "to mention in the affidavit that [Defendant] did not match the description the CI gave as the seller of drugs." [Id. at 13-15]. The court need not linger in addressing the Franks challenge.

Initially, the court notes that Defendant presents no argument satisfying his burden of a substantial preliminary showing that the affiant intentionally or recklessly omitted material information from the affidavit in order to mislead the issuing judge and that would have negated probable cause. See United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009) ("The defendant bears the burden of showing that, 'absent those misrepresentations or omissions, probable cause would have been lacking.'") (citation omitted); Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997) ("[A] warrant affidavit violates the Fourth Amendment when it contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit.'") (citation omitted).

Based on the allegations made by Defendant [Doc. 65 at 13-15, 28], whether the affidavit provides sufficient information for the issuing judge to determine the

---

[6]The court notes that, although the affiant met with and obtained information from the CIs on June 10, 2014, the first controlled buy did not take place until June 18, 2014. [2014 Affidavit ¶¶ 4-5].

12

reliability of the various confidential informants is not an issue to be resolved by a Franks hearing, instead, is resolved by consideration of the information contained within the four corners of the affidavit.[7]  The court will address Defendant's argument on this ground *infra*.  And, as regards either the June 10, 2014, information provided by the CIs or the June 18, 2014, controlled drug buy, Defendant is simply wrong about the contents of the affidavit.  With respect to the information provided on June 10, 2014, the affiant specifically stated as follows about the "older Hispanic male" that the CIs observed interacting with Joey at the Subject Residence:  "Based on the description, this subject that they[, the CIs], are referring to is not AVALO but ROBERTO GONZALES."  [2014 Affidavit ¶ 4].  And, if Defendant meant to refer to the controlled buy on June 18, 2014, the affiant included in the affidavit that "the Hispanic male" - apparently involved in the controlled buy that day - was Joey's "Boss's Nephew" - a "thin Hispanic male, early 30's in age" - not Defendant, who was subsequently referred to as Joey's "Boss."[8]  [Id. ¶¶ 5, 7].  The court finds that the

_____

[7]Defendant did not make an offer of proof that affiant possessed at the time he prepared the affidavit specific information about the confidential informants discrediting their reliability that he intentionally or recklessly omitted.

[8]And the court notes that, previously in the affidavit, the affiant referred to Defendant as an older Hispanic male [Id. ¶¶ 2-3], allowing the issuing judge to determine without being told, although the affiant did so, that Defendant was not the

13

affiant advised the issuing judge that Defendant was not the individual observed by the CIs during their trips to the Subject Residence to buy drugs.   Defendant has not identified any "favorable details" omitted from the affidavit.

For these reasons, the court denies Defendant's request for a <u>Franks</u> hearing.

### 2.   Probable Cause

Defendant contends that the search warrant is not supported by probable cause because of the inclusion of stale information and because of the failure to provide sufficient information to establish the reliability of the confidential informants.  [Doc. 65 at 13-15, 25-26, 28].  The Government, in opposition, points out that the allegedly stale information in the affidavit is "refreshed" by the June 2014 controlled buys at the Subject Residence and that the totality of the information contained in the affidavit establishes the reliability of the informants.  [Doc. 67 at 22-37].  The Government is correct.

The issuing magistrate judge, in deciding whether to sign a search warrant, is "'simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that

─────────────────────

Hispanic male described on June 18, 2014.

14

contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983)) (internal quotation marks omitted).  In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."  United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same).  In reviewing the issuance of a search warrant, the undersigned must determine only that the issuing judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant.  See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam).  The validity of the warrant is considered based on the totality of the circumstances.  See Brundidge, 170 F.3d at 1352.

15

Before addressing the issue of whether the information provided in the affidavit is too stale to support a finding of probable cause, the court will clarify what information is significant to the probable cause finding.  Defendant points to the lack of information in the affidavit identifying Defendant as the individual observed at the Subject Residence when, for example, the controlled buys occurred.  [Doc. 65 at 13-15].  Defendant's presence or absence at the time that drug dealing is occurring, undisputedly at his residence, is not a fact material to the probable cause determination.  The affidavit had to establish that "'there is a fair probability that contraband or evidence of a crime will be found in a particular place[,]'" Jiminez, 224 F.3d at 1248 (citation omitted), that is, that evidence of drug trafficking would be at the Subject Residence not that Defendant would eventually be found guilty of or even arrested for these offenses.  The probable cause determination focuses on the place to be searched not on whether any individual is guilty of any specific criminal conduct.  "Search warrants are not directed at persons; they authorize the search of 'place[s]' and the seizure of 'things,' and as a constitutional matter they need not even name the person from whom the things will be seized." Zurcher v. Stanford Daily, 98 S. Ct. 1970, 1976 (1978) (citations omitted).  "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe

16

that the specific 'things' to be searched for and seized are located on the property to which entry is sought." Id. at 1976-77; and see Haire v. Thomas, 219 Fed. Appx. 844, 846 (11th Cir. 2006) (the evidence offered in support of the search warrant "did not necessarily have to implicate [the defendant] in the crime"). And the information in the affidavit is more than sufficient to make this showing.

The affidavit is not based solely upon stale information contrary to Defendant's selective identification of only the historical information provided about his activities in 2004, 2010, and 2013 in the affidavit to support his argument. The "staleness doctrine in the context of probable cause . . . requires that the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000); see also United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994) ("To satisfy the probable cause standard, the government 'must reveal facts that make it likely that the items being sought are in that place when the warrant issues.'") (quoting United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985)). "Warrant applications based upon stale information fail to create a probable cause that similar or other improper conduct is continuing." Harris, 20 F.3d at 450. In deciding whether information in a warrant is stale, each case is decided "based on the unique facts presented[,]" id., and

17

"[t]here is no particular rule or time limit for when information becomes stale[,]" Bervaldi, 226 F.3d at 1265. "In this case-by-case determination[, a court] may consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." Harris, 20 F.3d at 450 (citations omitted). And, in considering these factors, an issuing judge may rely on reasonable inferences drawn from the facts stated in the affidavit. See United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009) ("'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .'") (citation omitted); United States v. Wiley, 475 F.3d 908, 916 (7th Cir. 2007) ("'. . . issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense'") (citation omitted).

To begin with, the court notes that the nature of the drug trafficking activity under investigation as described in the affidavit is ongoing, describing such activity from at least 2004 and continuing up to just days before the search warrant was obtained, as evidenced by the controlled buys, and, therefore, is not discrete conduct occurring years ago which may not support a finding of probable cause. [2014

18

Affidavit ¶¶ 1-7].  Also the criminal conduct continually occurred at one location, the Subject Residence.  These facts undermine Defendant's staleness argument as regards the historical information contained in the affidavit.  In Harris, the court found that the information contained in an affidavit supporting the warrant application was not fatally stale, even though "most of the information contained in the affidavit referred to events which took place over two years before [the officer] applied for the warrant . . . ."  20 F.3d at 450-51.  Significant to the court's determination was the affidavit's allegations of a "longstanding and protracted criminal conspiracy" involving money laundering and the distribution of drugs.  Id. at 451; and see United States v. Johnson, 290 Fed. Appx. 214, 223 (11th Cir. 2008) (rejecting the defendant's claim of staleness, therein fifteen days, to search a residence associated with an ongoing, drug trafficking operation, and citing cases finding much older information, such as, six months, Bervaldi, 226 F.3d at 1264-67, eleven months, United States v. Hooshmand, 931 F.2d 725, 735-36 (11th Cir. 1991), and nine months, Domme, 753 F.2d at 953-55, due to nature of offenses, was not stale); United States v. LaMorie, 100 F.3d 547, 554 (8th Cir. 1996) ("Where continuing criminal activity is suspected, the passage of time is less significant.").

19

However, most significant to the court's rejection of Defendant's staleness argument is the fact of the two controlled drug buys occurring within days of issuance of the search warrant. The affiant described in the affidavit the information received from CI 84-460 and CI 84-461 on June 10, 2014, which included that a Hispanic male was trafficking large quantities of methamphetamine out of the Subject Residence. The CIs advised the affiant they do not enter the Subject Residence but travel there with Joey[9] and that he enters the Subject Residence, retrieves the methamphetamine, and delivers the drugs to the CIs. [Id. ¶ 4]. Then on June 18, 2014, the affiant met with CI 84-460 and CI 84-461 in order to conduct a controlled buy. After searching the CIs' persons and vehicle and finding no contraband, funds were provided for the drug purchase. The CIs met with Joey as arranged and traveled with him to the Subject Residence, as observed by the affiant. Shortly thereafter, the affiant observed the CIs and Joey leaving the Subject Residence. The CIs then met with the affiant and provided him with a quantity of methamphetamine obtained from Joey in the driveway of the Subject Residence. Another controlled buy by the CIs was conducted, following

---

[9]The court also notes that the affiant included information from a DeKalb County police officer that, on June 20, 2014, an alleged Hispanic heroin trafficker, Joey (as identified by his vehicle), was followed to the Subject Residence, where he remained overnight. [Id. ¶ 6].

20

the modus operandi on June 18, within seventy-two hours of the warrant being issued. [Id. ¶¶ 5, 7]. Even without the allegedly stale information, the controlled buys provide probable cause for issuance of the search warrant. See United States v. Roundtree, 299 Fed. Appx. 905, 907 (11th Cir. 2009) ("It is clear that a properly executed controlled buy . . . is sufficient, standing alone, to establish probable cause."); United States v. Horne, 198 Fed. Appx. 865, 871 (11th Cir. 2006) (noting that "'[g]enerally, a controlled buy, when executed properly, is a reliable indicator as to the presence of illegal drug activity[,]'" because "[a] 'common sense view to the realities of normal life' . . . leads to the conclusion that a residence contains drugs when a person enters that residence with no drugs and exits approximately one minute later with drugs") (citations omitted).

And, finally, contrary to Defendant's argument, the affidavit provided sufficient information for the issuing judge to find the confidential informants reliable. Defendant is correct that the affiant did not provide details about the confidential informants' backgrounds and/or prior cooperation with law enforcement. "If an informant is mentioned in the affidavit, the affidavit must demonstrate the informant's 'veracity' and 'basis of knowledge.'" United States v. Johnson, 444 Fed. Appx. 424, 425 (11th Cir. 2011) (quoting Gates, 103 S. Ct. at 2332). "However, '[w]hen there is

21

sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.'" Id. (quoting United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002)); and see United States v. Foree, 43 F.3d 1572, 1576 (11th Cir. 1995) (corroborating evidence gathered by officers can provide indicia of reliability).   However, "[i]ndependent police corroboration of a confidential informant's statement is not a requirement in every case." United States v. Roland, 133 Fed. Appx. 660, 662 (11th Cir. 2005) (citing examples where independent corroboration not required).  In the affidavit, there are other indicators that provide corroboration of the information provided the informants.

First, the totality of the information provided by the separate informants, relating their association with Defendant and drug trafficking at his residence over a ten year period, from 2004 to June 2014, supports the reliability of each individual informant's account of his or her association with Defendant.[10]  The first hand accounts set forth in the affidavit of the informants' interactions with Defendant or with individuals distributing drugs out of his residence and the fact that the informants' were providing incriminating information about their own activities, as well as Defendant's,

_____

[10]The court also notes that one of the individuals providing information about Defendant's drug dealing was not a "confidential" informant but was identified in the affidavit by name.  [2014 Affidavit ¶ 2].

AO 72A
(Rev.8/82)

additionally lends credibility to the information that each informant provided.[11]  See,

e.g., Gates, 103 S. Ct. at 2330 (when it is clear from the affidavit that the informant

was recounting events that he observed firsthand; the tip is entitled "to greater weight

than might otherwise be the case"); United States v. Mitchell, 366 Fed. Appx. 6, 14

(11th Cir. 2010) ("An affidavit that recites the statements of an informant can provide

a substantial basis for a finding of probable cause because an explicit and detailed

description of alleged wrongdoing, along with a statement that the event was observed

firsthand, entitles an informant's tip to greater weight than might otherwise be the

case.") (citation and internal quotation marks omitted); United States v. Deering, 296

Fed. Appx. 894, 899 (11th Cir. 2008) (noting that the informant "showed a detailed

knowledge" and provided personal observations of the activity under investigation);

United States v. Barfield, 507 F.2d 53, 58 (5th Cir. 1975) (because the informant was

acting against his penal interest in admitting to the drug activity, "[t]his supplied its

own indicia of reliability"); and see United States v. Le, 173 F.3d 1258, 1266 (10th Cir.

---

[11]The information provided by CI 84-460 and CI 84-461 was corroborated not only as discussed *infra* but by the separate drug investigation conducted by the DeKalb County Police Department.  The informants' account of obtaining drugs from Defendant's residence included the participation of Joey.  [2014 Affidavit ¶¶ 4-5, 7]. DeKalb County officers, conducting an investigation of Hispanic drug dealers, observed Joey's vehicle traveling to and remaining overnight at Defendant's residence in June 2014.  [Id. ¶ 6].

1999) ("[I]t was against the penal interest of the informants to provide this type of information to police, a factor we have considered indicative of reliability."); LaMorie, 100 F.3d at 553 (information was provided by an individual who participated in the crimes explaining her basis of knowledge for the events and constituting statements against interest "which naturally carry considerable weight").

And with respect to CI 84-460 and CI 84-461, their reliability is corroborated by the two controlled buys made shortly before the search warrant was obtained and executed.  See, e.g., United States v. Hodges, 616 Fed. Appx. 961, 964-65 (11th Cir. 2015) ("The circumstances of the two controlled purchases of marijuana provided sufficient independent corroboration of the CI's account such that there was no need to establish his veracity."); United States v. Hawkins, 278 Fed. Appx. 629, 634-35 (6th Cir. 2008) (although the affidavit did not contain information about the CI's reliability, the necessary independent police corroboration of the CI's veracity is provided by controlled buy of drugs); United States v. Bramlett, 232 Fed. Appx. 940, 943 (11th Cir. 2007) ("without the statements in the affidavit regarding the CI's past reliability, there was a monitored controlled buy and 'sufficient independent corroboration of [the] informant's information,' and, thus, no need to prove the CI's reliability") (citation omitted); United States v. Thomas, 159 Fed. Appx. 979, 982 (11th Cir. 2006) ("the

24

informant's statements were corroborated by two controlled purchases from the apartment that yielded cocaine and ecstasy"); United States v. Wilkerson, 2010 WL 4624046, at *3 (M.D. Ala. August 18, 2010) ("Most important, officers were able to corroborate the sources' information immediately prior to executing the search warrant by making a controlled purchase from defendant."); United States v. Graham, 2006 WL 890661, at *4 (M.D. Fla. April 6, 2006) ("contrary to Defendant's argument, there was no need to establish the CI's veracity in the affidavit because the controlled buy was an independent corroboration of the CI's credibility").

For these reasons, the court finds that the affidavit provided sufficient indicia of reliability for the issuing judge to evaluate the credibility of the confidential informants.  The court finds that the affidavit for the search warrant established probable cause to search Defendant's residence and surrounding curtilage.

### 3.    Good Faith

Finally, as the Government correctly argues, even if the affidavit did not establish probable cause, the evidence seized from Defendant's residence should not be suppressed because the good faith exception to the exclusionary rule should be applied in this case.  [Doc. 67 at 37-40].  In United States v. Leon, 104 S. Ct. 3405 (1984), and Massachusetts v. Sheppard, 104 S. Ct. 3424 (1984), the Supreme Court

established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  In United States v. Accardo, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court.  With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies.  Id. at 1480 & n.4 (citations omitted).  The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'"[12]  Id. at 1480 (quoting Leon, 104 S. Ct. at 3422).  In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered.  Id. at 1481.

---

[12]As the court determined *supra*, the affiant did not intentionally or with deliberate recklessness omit material information from the affidavit.

The search warrant for Defendant's residence was not "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]'" Leon, 104 S. Ct. at 3421 (citation omitted).  The court notes that the affidavit supporting the search warrant was not a "'bare-bone' statement of nothing more than conclusory allegations" which the Supreme Court in Leon found indicative of warrants falling within the third exception to the good faith doctrine.  See United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998).  The affidavit included details about the affiant's training and experience, about information related from confidential informants, about prior law enforcement activity involving Defendant, and about surveillance conducted surrounding illegal drug distribution at Defendant's residence, including the two controlled buys.  This affidavit presented much more than conclusory, "bare-bone" assertions for consideration by the issuing judge.  The affidavit provided factual details for the issuing judge to consider and evaluate.  The law enforcement officers were, therefore, entitled to rely upon that evaluation and determination that "given all the circumstances set forth in the affidavit before [the judge], there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place."  Gates, 103 S. Ct. at 2332.  And the evidence seized from Defendant's property in July 2014 is admissible at trial.

27

c.      Conclusion

For the foregoing reasons and cited authority, the court **DENIES** Defendant's request for a <u>Franks</u> hearing and **RECOMMENDS** that Defendant's motion [Doc. 61] to suppress evidence seized pursuant to execution of the 2014 Search Warrant be **DENIED**.

III.    **Search Cellular Telephone**

a.      **Consent**

On July 14, 2015, when the 2015 federal search warrant was executed, Defendant was detained by law enforcement officers.  Prior to his arrest on state felon in possession of a firearm charges, a cellular telephone on his person was seized, and the Government contends that Defendant voluntarily consented to the search of that device.  [Doc. 86].  Defendant, to the contrary, asserts that due to the circumstances of his detention and the events surrounding execution of the federal search warrant, his consent to search was not voluntary but merely the result of acquiescence to the show of force by law enforcement authorities.   [Doc. 85].  Based on the totality of the circumstances established at the evidentiary hearing, the court finds that Defendant's consent was voluntary and recommends that his motion to suppress be denied.

28

### 1.    Facts

On July 14, 2015, at approximately 6:00 a.m., officers with the Paulding County Sheriff's Office ("PCSO") and agents with the Haralson-Paulding Drug Task Force ("HPDTF") and with the Drug Enforcement Administration ("DEA") traveled to Defendant Avalo's residence, 9674 Villa Rica Highway, Villa Rica, Georgia, in order to execute the aforementioned federal search warrant.[13]  (Tr. at 4-5, 20-21).  PCSO SWAT were present to provide perimeter security, that is, two team members were placed on each side of the residence for security for the entry team, and eight to ten members were assigned to enter and secure the interior of the residence prior to the search.[14]  (Tr. at 7-8, 15, 20).  All of the SWAT officers were attired in tactical uniforms, with ballistic vests (and, although not clear, probably Kevlar helmets), and most were armed with long rifles as well as holstered handguns.  (Tr. at 7-8, 16-17, 22-23, 31-33).

---

[13]The warrant authorized the agents and officers to search for firearms, ammunition, currency and documents.  (Tr. at 35-36; Gov't Exhs. 2-3).

[14]The HPDTF and DEA agents, numbering approximately ten, were located on Defendant's property but not in sight of the residence waiting for SWAT to secure the residence and anyone present.  (Tr. at 15, 36-37, 51-52).

29

Lieutenant Billy Hurst, PCSO, with the K-9 division, and Deputy Nathaniel Hicks, PCSO SWAT, were assigned perimeter security, on the front side of the residence, and drove up to that side of the residence with blue lights activated, to ensure the occupants were aware of the law enforcement presence, and with high-beam headlights illuminating the front of the residence. (Tr. at 4-7, 19-22, 29; Gov't Exh. 1). As Hurst and Hicks exited the police vehicle, Hurst aimed his handgun, a Glock, and Hicks aimed his long rifle at the residence.[15] They observed an unidentified male, fully dressed, later identified as Defendant Avalo, standing on the front porch of the residence. (Tr. at 8-9, 14, 23-24, 30-31). Hurst, in a loud voice, advised Defendant, "Sheriff's Office. Show me your hands." And other officers, as well as a voice over a PA system, also identified the officers as "Sheriff's Office" and issued commands.[16] (Tr. at 8-10, 23-24). Hurst and Hicks pointed their weapons at Defendant. (Tr. at 8-10, 17, 23-24, 32). Defendant complied with the commands by showing his hands, lying face down on the porch and placing his hands behind his back. (Tr. at 9, 24-25).

---

[15]Hicks was also armed with a holstered handgun which was not drawn that morning. (Tr. at 22).

[16]The officers and agents communicated with Defendant in English. (Tr. at 8, 39, 43). No issue has been raised regarding Defendant's ability to communicate in English. [Doc. 85].

As Hurst and Hicks approached Defendant, Hurst lowered his handgun to the low-ready position, that is, pointed at the ground, and Hicks, lowered his long rifle, in order to place flex-cuffs[17] on Defendant, detaining him for officer safety.  (Tr. at 9-11, 17, 24-26).

After patting Defendant down for weapons, Hurst and Hicks assisted him in standing and escorted him off the porch and over to the tailgate of a pick-up truck and assisted Defendant with sitting on the tailgate.  (Tr. at 11-12, 18, 25-27).  Hurst holstered his firearm, and Hicks kept his rifle slung over his shoulder pointed to the ground.  (Tr. at 11, 25-27).  Once SWAT secured the residence, all of the firearms were holstered and long rifles were pointed at the ground.  No firearms were pointed at Defendant.  (Tr. at 11-13, 25, 27-28).

Hurst and Hicks did not have any conversation with Defendant.  (Tr. at 12, 27). They remained with him, for ten to twenty minutes, until Agent Horsley with the HPDTF and Agent Tyrone Lawary with the DEA arrived to take custody of him.  (Tr. at 12-14, 28).  Although, as Hurst stated, Defendant may have initially felt threatened when SWAT approached the residence and detained him, neither Hurst nor Hicks

---

[17]Flex-cuffs are plastic and used in these situations due to ease of placing on a suspect and removing.  (Tr. at 10, 24).

verbally threatened Defendant or made him any promises while Defendant was seated on the truck tailgate.  (Tr. at 12-13, 27-28).  And, except as described while handcuffing and assisting Defendant, they did not physically touch him.  (Tr. at 13, 27).

After receiving word that SWAT had secured the residence, at approximately, 6:10 to 6:15 a.m., Agent Lawary along with the other DEA and HPDTF agents approached the residence.[18]  (Tr. at 36- 37, 51-52).  The agent observed SWAT exiting the residence, and he did not observe any drawn firearms.  (Tr. at 37).  Although not hundred percent sure of the sequence of events, the agent recalls walking over to where Defendant was seated on the truck tailgate, identifying himself and asking, "[H]ey, how you doing? Are you doing alright?  We'll talk in a second."  (Tr. at 37-39, 52).  Agent Lawary entered the residence to look around briefly and then exited to speak with another person who was present and was believed to work for Defendant and with the occupants of a vehicle that arrived at the residence.  Those individuals were released.  (Tr. at 37-38, 52).  The agent then walked back over to Defendant.  (Tr. at 39, 52).

---

[18]The agent was attired in long pants and a long sleeve shirt, under which he wore a concealment vest.  His firearm was holstered the entire morning.  (Tr. at 47).

32

Agent Lawary and Defendant walked over to the porch, and Defendant's handcuffs were removed; however, Defendant was detained.  (Tr. at 39-41, 52-53). They sat in chairs on the porch, and the agent formally introduced himself with his badge and advised Defendant that he was conducting a drug investigation.  (Tr. at 39-40, 53).  At approximately 6:50 a.m., Agent Lawary verbally advised Defendant of his Miranda rights, and Defendant agreed to speak with him.  (Tr. at 39, 41, 53, 58-61). The agent then asked Defendant if there were any dangerous items in the residence, such as, bombs or firearms.  Defendant advised that there were two firearms in the residence and described the locations of the firearms.[19]  The agent asked two other agents present to secure the weapons.  (Tr. at 41-42, 54, 60-61).  The agent then advised Defendant of the Miranda rights again using a form with a waiver of rights; Defendant again agreed to waive his rights and executed the form.[20]  (Tr. at 42, 58-59). Defendant spoke with the agent for approximately twenty to twenty-five minutes.  (Tr. at 46, 57).

_____

[19]Agent Lawary was aware that Defendant was a convicted felon making his firearm possession unlawful.  (Tr. at 42).

[20]Because the issue of Defendant's waiver of Miranda rights was not the subject of the evidentiary hearing, neither party provided details of the advice of rights and waiver of those rights.

AO 72A
(Rev.8/82)

During the conversation, the agent spoke to Defendant in a conversational tone. Defendant answered all of the agent's questions; he was cooperative.  (Tr. at 43). Defendant appeared to understand the agent.  (Tr. at 43).  Towards the end of the conversation, at approximately 7:20 a.m., because the agent was aware Defendant would be arrested on state felon in possession of a firearm charges, the agent seized from Defendant's person a cellular telephone, a LP flip phone, and a wallet.  (Tr. at 43, 55, 57).  Based on his investigation, the agent was interested in searching Defendant's cellular telephone.  (Tr. at 46, 55-56).

The agent asked Defendant if the cellular telephone was his, and Defendant responded, yes.  He then asked if Defendant would consent to a search of his cellular telephone, and Defendant responded, yes.  (Tr. at 43, 56).  The agent asked for the number of the cellular telephone, which Defendant provided, and the agent wrote the number on the consent to search form.  (Tr. at 44-45, 56; Gov't Exh. 5).  The form states:

1.   I have been asked to permit Special Agents of the Drug Enforcement Administration to Search: . . . LG Phone 404-447-3649

2.   I have not been threatened, nor forced in any way.

3.   I freely consent to this search.

34

(Gov't Exh. 5).  Defendant, who had advised that he could read English, appeared to read the form.  (Tr. at 45).  Agent Lawary asked Defendant, if he consented to the search, to sign the form; Defendant did so as witnessed by the agent.[21]  (Tr. at 44-45; Gov't Exh. 5).  During the conversation with Defendant and while obtaining his consent, the tone of the conversation was casual.  The agent did not draw his weapon, and no weapons were pointed at Defendant.  The agent did not threaten Defendant or make him any promises.  Defendant remained free of handcuffs, and he was not touched except to remove the wallet and cellular telephone. (Tr. at 47-48).  Defendant did not appear to be under the influence of drugs or alcohol.  (Tr. at 48).  Defendant did not advise the agent that he had been mistreated or threatened earlier in the morning.  (Tr. at 47).  After completing the conversation with Defendant, he was escorted inside the residence where he waited for approximately thirty-five to forty-five minutes for the search to be completed.  He was then transported to jail on the local charges.  (Tr. at 46, 56-57).

---

[21]At the hearing, Agent Lawary stated that, if Defendant had refused to consent, the agent would have sought a search warrant for the cellular telephone based on the information he had gathered during the investigation indicating that Defendant had used a cellular telephone to communicate with co-conspirators.  (Tr. at 46, 55-56; Gov't Exh. 3).

Additional facts will be set forth as necessary during discussion of the motion to suppress.

### 2.   Discussion

In support of his argument that his consent was not voluntary, Defendant relies on the following facts:  (1) that fifteen to twenty armed SWAT officers, attired in tactical gear, arrived at his residence in at least six police vehicles with blue lights activated at 6:00 a.m.; (2) that multiple weapons were pointed at him and multiple officers issued commands to him to show his hands and lie on the ground; and (3) that he was placed in flex-cuffs and detained.  [Doc. 85 at 2-6].  Based on these facts, Defendant asserts, citing in support of his position Eleventh Circuit Court of Appeals' decisions United States v. Tovar-Rico, 61 F.3d 1529 (1995), and United States v. Edmondson, 791 F.2d 1512 (11th Cir. 1986), that his consent to search his cellular telephone was not voluntary but that he merely acquiesced to the law enforcement officers' show of force.  [Id. at 8-13].  The Government responds that, at the time that Defendant consented to the search, the facts establish that Defendant, who executed a written consent to search form, was not subjected to the use of force and was not coerced.  [Doc. 86 at 7-12].  In the alternative, the Government contends that the

36

inevitable discovery doctrine applies, because if Defendant had refused consent, the agents intended to secure a search warrant for his cellular telephone.  [Id. at 14-16].

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [a home] without a warrant so long as they first obtain the voluntary consent [for the search]."  United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (citing Schneckloth v. Bustamonte, 93 S. Ct. 2041 (1973)).  "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances."  Id. at 798 (citing Schneckloth, 93 S. Ct. at 2059); see also United States v. Nuyens, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances.").  "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily."  Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).

37

As the Eleventh Circuit Court of Appeals affirmed in <u>United States v. Acosta</u>, 363 F.3d 1141 (11th Cir. 2004), "determining whether consent was 'voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis.'" <u>Id.</u> at 1151 (quoting <u>Blake</u>, 888 F.2d at 798).  In conducting this case-by-case analysis, factors considered by courts in assessing voluntariness include, but are not limited to: "'voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" <u>Blake</u>, 888 F.2d at 798 (citations omitted); <u>see also</u> <u>Purcell</u>, 236 F.3d at 1281 (same).

However, "the government need not establish [a defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of effective consent.'" <u>United States v. Zapata</u>, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting <u>Ohio v. Robinette</u>, 117 S. Ct. 417, 421 (1996)); <u>accord</u> <u>United States v. Brown</u>, 223 Fed. Appx. 875, 880 (11th Cir. 2007) ("the government is not required to prove that the defendant knew he had the right to refuse consent, and a defendant's lack of knowledge of this right is not dispositive, but is just one factor to consider in evaluating the totality of the

38

circumstances"); United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2005) ("To the extent Pineiro suggests that the police were required to be more specific in advising him of his rights, and were required to tell him he had a right to refuse consent, this Court has squarely rejected this argument."). And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment[,]" Schneckloth, 93 S. Ct. at 2055, the Supreme Court explained that, while a consent to search must be voluntary, it need not be "'an intentional relinquishment or abandonment of a known right or privilege[,]'" that is, knowing and intelligent. Id. at 2055-56 (citation omitted); see also Tukes v. Dugger, 911 F.2d 508, 516 (11th Cir. 1990) (same). "'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of up-holding what appears to be a voluntary consent.'" United States v. Alim, 256 Fed. Appx. 236, 239 (11th Cir. 2007) (quoting United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973)).

The facts presented at the evidentiary hearing establish that Defendant's consent to search was voluntary. Although Defendant is correct that his initial encounter with law enforcement officers on July 14, 2015, when they approached his residence, detained him, and conducted the security sweep of his residence was intimidating

[Doc. 85 at 2-6], the situation quickly normalized, calmed-down and became non-coercive.   As Defendant notes, fifteen to twenty armed, tactically-attired SWAT officers arrived at approximately 6:00 a.m. at his residence to execute the federal search warrant.  (Tr. at 5-8, 14-15, 21-24, 31-33).  Eight of the officers surrounded his residence, and two of those officers interacted directly with Defendant - pointing their firearms at him and issuing commands to Defendant - while an additional eight to ten SWAT officers entered his residence.  (Tr. at 7-10, 17, 23-25, 32).  Defendant clearly merely acquiesced to the commands to show his hands, lie on the ground and place his hands behind his back.  (Tr. at 9-10, 24).  As Lt. Hurst stated, Defendant may have initially felt threatened when SWAT approached the residence and detained him.  (Tr. at 13).  However, as soon as Defendant did comply, all weapons were pointed towards the ground, and once Defendant and the residence were secured, within minutes of the initial encounter with Defendant, firearms were holstered or, if a long rifle, remained pointing towards the ground.  (Tr. at 10-12, 17, 25-28).

And, although Defendant was flex-cuffed and detained, after being assisted to stand, escorted to the tailgate of the truck, and assisted in sitting on the tailgate, no one else physically touched him or restrained him.  (Tr. at 9-13, 26-28).  Defendant was not

40

questioned by, threatened by or made promises by the SWAT officers during the time that they spent with him.  (Tr. at 12-13, 27-28).

And, when Agents Lawary and Horsley approached the residence at approximately 6:10 to 6:15 a.m., no handguns were drawn and the scene was calm. (Tr. at 36-37, 51-52).  Agent Lawary, who did not participate in either Defendant or the residence being secured and who was casually dressed, with his firearm holstered, approached Defendant, introduced himself and checked to be sure Defendant was okay.  (Tr. at 36-39, 47, 52).  After a few minutes, the agent escorted Defendant to the porch of the residence, had the flex-cuffs removed, and, at approximately, 6:50 a.m., sat with Defendant and began speaking to him by advising Defendant of his Miranda rights.  (Tr. at 39-41, 53-54, 58).  Defendant agreed to speak to the agent and provided information about the locations of firearms in the residence.  (Tr. at 41-42, 54, 60-61). Defendant was then presented with a Miranda rights and waiver form, which he signed and, thereafter, spoke to the agent for twenty to twenty-five minutes.  (Tr. at 42, 57-58).

Over an hour after the initial encounter with the SWAT officers, at approximately 7:20 a.m., Agent Lawary verbally asked for Defendant's consent to search his cellular telephone.  Defendant consented.  (Tr. at 43-45, 55, 57).  After

41

Defendant provided the number for his cellular telephone, which the agent used to fill out a consent to search form, the agent presented the form to Defendant, who appeared to read the form.  (Tr. at 44-45, 55-56; Gov't Exh. 5).  The form states:

1.     I have been asked to permit Special Agents of the Drug Enforcement Administration to Search: . . . LG Phone 404-447-3649

2.     I have not been threatened, nor forced in any way.

3.     I freely consent to this search.

(Gov't Exh. 5).  Agent Lawary asked Defendant, if he consented to the search, to sign the form; Defendant did so as witnessed by the agent.  (Tr. at 44-45; Gov't Exh. 5). During the conversation with Defendant and while obtaining his consent, the tone of the conversation was casual.  The agent did not draw his weapon, and no weapons were pointed at Defendant.  The agent did not threaten Defendant or make him any promises.  Defendant remained free of handcuffs, and he was not touched except to remove the wallet and cellular telephone.  (Tr. at , 47-48).  Defendant did not appear to be under the influence of drugs or alcohol.  (Tr. at 48).  Defendant did not advise the agent that he had been mistreated or threatened earlier in the morning.  (Tr. at 47).

At the time of his consent, over an hour after he was initially secured by armed officers, Defendant had been advised of his <u>Miranda</u> rights, had been cooperative with

42

the agents by answering questions, was asked for consent both verbally and using a written form, was not threatened or made any promises, and, although being detained, was not physically restrained. Defendant did not complain of having been threatened or mistreated. Accordingly, the court finds that, even if the initial encounter with Defendant was threatening, by the time that he was asked to consent to the search, sufficient time had elapsed and the circumstances were no longer threatening.

The fact that Defendant was being detained, in fact, even if he was found to be under arrest, "does not necessarily vitiate [his] valid consent to search." United States v. Smith, 199 Fed. Appx. 759, 763 (11th Cir. 2006). In fact, arrest situations involving similar if not greater demonstrations of force and physical restraint of a suspect, and with a shorter lapse of time before the consent was obtained, have been upheld after finding that consent was not coerced. See, e.g., United States v. Kimoana, 383 F.3d 1215, 1225-26 (10th Cir. 2004) (although "officers entered the motel room with guns drawn, raising their voices at the occupants and ordering them to put their hands where the officers could see them[,]" the trial court found that "[a]fter performing a pat down, the officers put their weapons back in their holsters, the atmosphere was described as 'calm,' and then [the officer] 'immediately' asked [the defendant] for consent to search the room[;]" therefore, when the consent to search was obtained, the situation had

43

calmed down and no show of force was being exhibited); United States v. Taylor, 31 F.3d 459, 463-64 (7th Cir. 1994) ("The record shows that the initial melee of agents, badges and weapons, necessary to protect the safety of the agents . . ., dissipated only seconds after it had begun and that all was routine once the premises had been secured. Though certainly unpleasant, there is nothing so inherently coercive about such tactics, commonly used where a danger to life or limb is perceived by law enforcement agents, to render subsequent cooperation involuntary.")[22]; United States v. Hidalgo, 7 F.3d 1566, 1570-71 (11th Cir. 1993) (facts that the defendant "was arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint" did not establish consent to search was involuntary, even though consent was given after invocation of Miranda rights); United States v. Garcia, 890 F.2d 355, 360-62 (11th Cir. 1989) (the court found voluntary a consent to search which was given after the defendant was arrested by numerous officers, patted down for weapons and a protective sweep of his house was conducted and after he was seated in his living room in handcuffs, given his Miranda rights, and the officers had refused to accept a limited consent).

---

[22]In this case, the search warrant for Defendant Avalo's residence authorized the search for firearms, the presence of which could pose a threat to SWAT and other law enforcement officers.  (Tr. at 35; Gov't Exhs. 2-3).

44

Contrasted with the facts in other cases which courts have found did not invalidate the voluntariness of a consent to search, nothing in the events surrounding Defendant Avalo's consent to search results in a finding that his consent was merely acquiescence to an official show of authority.  In United States v. Strickland, 245 F.3d 368 (4th Cir. 2001), the Fourth Circuit Court of Appeals refused to find that a consent to search was involuntary.  In Strickland, officers arrived at the defendant's residence at 6:30 a.m. and unsuccessfully attempted to wake him by pounding on the door and the side of the trailer.  They, therefore, broke open the front door, entered, and handcuffed both the defendant's wife and the defendant, who at the time was dressed only in his underwear.[23]  Both were seated, handcuffed, in the living room - the defendant still in his underwear.  The agents asked if there were any weapons in the residence or any more marijuana, the agents having seen the latter on a kitchen counter.  The defendant pointed out the location of a firearm and responded negatively to the question about additional marijuana.  The agents then asked for consent to search the residence, and both the defendant and his wife consented.  Id. at 382-83.  The court upheld the consent finding that the officers did not use any force other than that

---

[23]The defendant's wife was advised that she was not under arrest but only handcuffed for officer safety.  Id. at 382-83.

necessary to effect the entry into the residence and to arrest the defendant and that no facts indicated that the defendant was coerced into consenting to the search.  Id.  See also United States v. Guiterrez, 92 F.3d 468, 470-71 (7th Cir. 1996) (the circumstances surrounding the consent, including approximately a dozen federal agents entering the premises with weapons drawn, handcuffing the individuals present and ordering them up against the wall, including the defendant, and the fear of being arrested, was not so inherently coercive to render the consent involuntary); United States v. Espinosa-Orlando, 704 F.2d 507, 512-13 (11th Cir. 1983) (the court found that the consent to search was voluntary although the defendant had been detained and placed on the ground by armed officers and although one of the officers still had his weapon drawn pointed away from the defendant at the ground, because there was no abusive language used and no threats, because the request was made in a conversational tone, and because the defendant was not handcuffed or removed from the scene of the stop and detention).

And the cases relied on by Defendant, Tovar-Rico and Edmondson, are factually distinguishable from the facts surrounding Defendant's consent in this case.  As stated by the Eleventh Circuit Court of Appeals in United States v. Aguilar, 519 Fed. Appx. 541 (11th Cir. 2013), in Tovar-Rico, the court found a defendant's consent to search

involuntary based on the following facts.  Five officers knocked on the defendant's door and asked to enter but then quickly entered, with firearms drawn, as soon as the door was opened and conducted a protective sweep.  519 Fed. Appx. at 544 (citing Tovar-Rico, 61 F.3d at 1536).  Although the defendant was advised that she did not have to consent to a search of the apartment (but told that "if she did not, 'the agents would come back with a search warrant'"), the consent was deemed involuntary because "the defendant 'had already observed officers explore every room in the apartment[, she] could not reasonably have known that she could still refuse a search.'" Id. (quoting Tovar-Rico, 61 F.3d at 1536).  Besides the fact that the search of Defendant Avalo's cellular telephone did not involve a search of his residence as in Tovar-Rico, the consent herein did not occur "mere seconds after agents stormed into the defendant's apartment[,]" see United States v. Joseph, 2015 WL 7258515, at *5 (S.D. Fla. November 17, 2015) (citing Tovar-Rico, 61 F.3d at 1535-36), but, as in Joseph, an hour after "the shock of the initial encounter with police had subsided significantly . . . ." Id. (finding the defendant voluntary consented to the search).  And Agent Lawary did not request Defendant's consent to search the cellular telephone after Defendant witnessed even a partial search of the device.  See Aguilar 519 Fed.

47

Appx. at 545-46 (distinguishing Tovar-Rico on this basis); United States v. Sharp II, 2015 WL 4641537, at *4 (N.D. Ga. August 4, 2015) (same).

Likewise, in United States v. Racca, 255 Fed. Appx. 367 (11th Cir. 2007), the Eleventh Circuit Court of Appeals distinguished not only the facts but the legal issue before the court in Edmondson. 255 Fed. Appx. at 368-70. In Racca, the defendant relied on the decision in Edmondson "to explain how the sheer number of officers present at the scene[, apparently five officers were surrounding the defendant when he consented,] made it impossible for him not to resist their request to conduct a search." Id. at 368. The court noted that the defendant consented to a search after signing a consent to search form as part of an interview during which the defendant was calm and answered questions clearly.[24] Id. at 369-70. Rejecting the defendant's reliance on Edmondson, the court stated:

> As for [the defendant's] apparent reliance on Edmondson, the Government correctly points out that that case arose out of a situation factually dissimilar to this case and presented a different legal question regarding the matter of consent. In Edmondson, [the court] considered, in relevant part, whether a suspect opening a door in response to the

---

[24]The court also apparently found that the defendant was young, twenty-three years old, and was not initially advised of his Miranda rights, although he contended being under arrest having been advised that he was being detained. And the court assumed that the agents advised the defendant that they would obtain a search warrant if he refused to consent. Id. at 368-70.

48

> demands of FBI agents then stepping back from the door and placing his hands on his head constituted *implied* consent to be arrested. . . .  The question in this case is not whether consent was given, but whether it was voluntarily given.  Here, [the defendant] signed a consent form after reading it twice and having it read to him once.

Id. at 370 (citing Edmondson, 791 F.2d at 1515) (emphasis in original).  The court in

Racca upheld the district court's finding that the defendant's consent was voluntary.

Id.  The same distinguishing factors apply to this case.  Again, the search at issue does

not involve Defendant Avalo's residence as did the facts in Edmondson.  Additionally,

the question before this court is not whether Defendant Avalo consented; he did so

once verbally and once by executing the consent to search form.  (Tr. at 43-45, 56;

Gov't Exh. 5).  As in Racca, the question before this court is whether that consent was

voluntary and not, as in Edmondson, whether Defendant's actions constituted implied

consent to search his cellular telephone.

### 3.   Conclusion

For the foregoing reasons and cited authority, the court finds that Defendant's

consent to search his cellular telephone was voluntary, and the court **RECOMMENDS**

that Defendant's motion [Doc. 61] to suppress the fruits of the search of the cellular

telephone be **DENIED**.

49

### b.    Inevitable Discovery Doctrine

Finally, the Government contends that, even if the court determined that Defendant's consent was involuntary, the contents of the cellular telephone are admissible as an exception to the exclusionary rule under the inevitable discovery doctrine. [Doc. 86 at 14-16]. "Under the inevitable discovery exception to the exclusionary rule, evidence obtained unlawfully my be admissible if the government can establish by a preponderance of the evidence that it ultimately or inevitably would have been discovered by lawful means." United States v. Norman, 638 Fed. Appx. 934, 937 (11th Cir. 2006) (citing Nix v. Williams, 104 S. Ct. 2501, 2509 (1984)); and see United States v. Virden, 488 F.3d 1317, 1322 (11th Cir. 2007) (same). "[I]n order to establish inevitable discovery the prosecution must show that the police possessed and were actively pursuing the lawful avenue of discovery when the illegality occurred." United States v. Khoury, 901 F.2d 948, 960 (11th Cir.), mod'd on other grounds, 910 F.2d 713 (11th Cir. 1990); and see Virden, 488 F.3d at 1322 (same). In United States v. Johnson, 777 F.3d 1270 (11th Cir. 2015), the Eleventh Circuit Court of Appeals explained the requirement of "active pursuit." The court stated, "'Active pursuit' does not require that police have already planned the particular search that would obtain the evidence." Id. at 1274-75 (Eleventh Circuit Court of Appeals'

50

"precedents make clear that the purpose of the requirement of active pursuit is to exclude evidence that was not being sought in any fashion."). "The government must instead establish that the police would have discovered the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.'" Id. at 1274 (quoting Virden, 488 F.3d at 1323); and see Norman, 638 Fed. Appx. at 937). The Government has met this burden in this case.

At the hearing, Agent Lawary stated that, if Defendant had refused consent to search his cellular telephone, the agent would have sought a search warrant for the device based on the information gathered during the investigation indicating that Defendant had used a cellular telephone to communicate with co-conspirators. (Tr. at 46, 55-56). The information gathered during the investigation and a wire intercept on Capote's telephone set forth in the affidavit for the July 2015 search warrant for Defendant's residence indicates that, in the Fall of 2014 and specifically in April 2015, Capote was probably communicating telephonically with Defendant to make arrangements for drug transactions with third parties. (Gov't Exh. 3, ¶¶ 16-32). Additionally, the affidavit for the July 2015 search warrant established probable cause that Defendant was engaged in drug trafficking activity which provides a basis for obtaining a warrant to search Defendant's cellular telephone, a tool of the drug trade.

51

See <u>Riley v. California</u>, 134 S. Ct. 2473, 2493 (2014) ("Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals."); <u>United States v. Correa</u>, 347 Fed. Appx. 541, 545 (11th Cir. 2009) (finding that in executing search warrant the agents "reasonably concluded that [the defendant's] cellular telephone, a 'known tool of the drug trade,' contained digital evidence about the conspiracy") (citation omitted).  In this case, "inevitable discovery applie[s] because [Agent Lawary was] investigating other leads that likely would have" resulted in obtaining a search warrant for Defendant's cellular telephone. <u>Johnson</u>, 777 F.3d at 1275; <u>and see</u> <u>Norman</u>, 638 Fed. Appx. at 938 (noting that the agents had sufficient evidence before the alleged illegal protective sweep to obtain a search warrant for the defendant's residence in which they believed evidence of illegal activity would be found).

For this reason, the court finds that, if the consent to search Defendant's cellular telephone is determined to be involuntary, the inevitable discovery exception to the exclusionary rule applies in this case and that the contents of the device is nevertheless admissible at trial.

52

## IV.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 61] to suppress the fruits of the 2014 and 2015 search warrants executed at his residence and of the consent search of his cellular telephone be **DENIED**.

The court further **ORDERS** that Defendant's motion [Doc. 61] for a <u>Franks</u> hearing on the affidavits for the 2014 and 2015 search warrants be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 5th day of October, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

53